UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOE,

      Plaintiff,                                         Case No.

                                                Hon.

v.

AQUINAS COLLEGE and AQUINAS
COLLEGE BOARD OF TRUSTEES and
KEVIN KWIATKOWSKI,
STEPHEN BARROWS, KEVIN QUINN,
SANDY HARLEY, THAD SALTER, and
HEATHER QUAKENUSH,
as agents for AQUINAS COLLEGE,
jointly and severally,

      Defendants.

_____

David A. Nacht (P47034)
Adam M. Taub (P78334)
NACHTLAW, P.C.
Attorneys for Plaintiff
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
dnacht@nachtlaw.com
ataub@nachtlaw.com

_____

## COMPLAINT AND JURY DEMAND

      Plaintiff, John Doe, by and through his attorneys, NACHTLAW, P.C.,

hereby alleges as follows:

## **INTRODUCTION**

1.     On or about August 14, 2017, Defendant Aquinas College expelled Plaintiff John Doe from campus after finding him responsible of an alleged sexual assault and harassment.

2.     In the process of expelling Plaintiff, Defendants illegally gave deference to the allegations of the female accuser while assuming that the accused male was responsible even when the weight of the evidence was to the contrary.

3.     In the academic setting, in Title IX proceedings, accused males, including Plaintiff, are being denied basic due process, impartiality, and fair investigations, hearings, and appeals. *See Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018).

4.     Unfortunately, educational institutions, like Aquinas, are not leaving sexual assault investigations to the police and criminal justice system with their related procedural protections, and instead, are adjudicating the sex lives of students—most of whom are living without parental oversight for the first time— without providing the accused fair protections.

5.     Here, Plaintiff's life has been irreparably upended due to a broken system that led to his expulsion for engaging in consensual activity with his accuser, Jane Roe ("Roe"), during his freshman orientation, on or about August 19, 2016.

6.     That night, Plaintiff first met Roe and her roommate ("Roommate").

7.     According to Roommate, when she noticed that Roe had been flirting with Plaintiff, Roommate decided to leave to spend the night with her boyfriend as she knew that Plaintiff and Roe would likely engage in sexual activity.

8.     Before leaving, Roe and Roommate jokingly pledged that Roommate would not have sex with her boyfriend if Roe did not have sex with Plaintiff.

9.     After Roommate left, Roe went to the bathroom and returned only wearing her bra and underwear and asked Plaintiff to kiss her. Plaintiff asked Roe about her pact with Roommate to which Roe replied that Roommate would be having sex with her boyfriend, so they could have sex.

10.    Roe then initiated sexual activity with Plaintiff, and the two engaged in consensual sex.

11.    More than eight (8) months later, Plaintiff was shocked to receive notice that he had been accused of sexually assaulting Roe. On information and belief, at no point during that period did Roe go to the police—as of the date of this Complaint, Plaintiff has received no indication that she has—nor did she tell Roommate that Plaintiff sexually assaulted her. Furthermore, on information and belief, Roe never sought medical attention related to the incident despite claiming she was bruised and bleeding the next morning. Finally, she posted a picture on

Instagram the day after the incident of her with Roommate where the two of them are smiling, and there is no visible bruising on Roe in the picture.

12.   Defendant Kevin Kwiatkowski, Aquinas' Director of Campus Safety, then began the process of an inadequate and bias investigation into Roe's allegations during which—contrary to Title IX and Aquinas' policies—he overstepped his role as an information gatherer and ignored the evidence exonerating Plaintiff and credited Roe's inconsistent statements. Even worse, he failed to provide Plaintiff—or include in the Investigative Report—a statement Roe made in December 2016, which contradicts her later statements from spring 2017.

13.   Troublingly, Kwiatkowski's Investigative Report includes a conclusion that there were excerpts from interviews that provide a preponderance of the evidence standard to support Roe's claim. The "excerpts" pertained to the amount of alcohol Roe allegedly consumed, ignoring all contrary witness statements.

14.   He wrote:

> *It is my consideration* that there is sufficient evidence for this matter to proceed within the policies and procedures regarding student conduct at Aquinas College. *It is my opinion* that the Complainant was not able to provide consent based on alcohol consumption.

(emphasis added)

4

15.     Yet, Aquinas' Sexual Assault Policy states, "The investigator prepares a written summary of the evidence. ***The summary is limited to facts and does not contain conclusions or credibility determinations***." (emphasis added)

16.     Had Defendants, including the Judicial Hearing Board ("JHB" or "Board")—comprised of Defendants Sandy Harley, Thad Salter, and Heather Quakenbush—actually reviewed the facts they would have found that Roommate and other witnesses all claimed that Roe was capable of consenting to sexual activity that night. Furthermore, Plaintiff's unwavering story—supported by a polygraph—is that Roe had around three shots of flavored vodka and stopped drinking more than an hour before engaging in sexual activity with Plaintiff. According to every witness there that night, Roe was ambulatory, coherent, fully functional, and showed no signs of intoxication to the point of incapacitation. Roe, who gave several inconsistent statements regarding her memory of the events, is the only one present that night who claims that she was too drunk to engage in consensual sex.

17.     Defendants also deprived Plaintiff of a fair hearing. Prior to the hearing, Defendants only gave Plaintiff one (1) hour to review Kwiatkowski's investigative interviews with Roe, ten (10) separate witness statements, and other evidence from the investigation. Plaintiff was not permitted to receive a copy of the statements, and he was not permitted to copy or record them in any way.

18.     Additionally, although he requested it several times, Plaintiff was denied access to Roe's initial statement in December 2016 and the final Investigative Report that was provided to the Judicial Hearing Board prior to the hearing.  He was only able to view information from December 2016 and the Investigative Report *after* the hearing and his expulsion when he requested a copy of his educational records under FERPA.

19.     Finally, at the hearing, Plaintiff could not directly cross-examine his accuser or any other witness and could not even face Roe as a physical barrier was placed between Plaintiff and Roe at the hearing. The hearing was limited to one (1) hour total and was cutoff ten (10) minutes early without explanation.

20.     As a result, Defendants denied Plaintiff a fair and impartial investigation and hearing, in violation of Title IX and Aquinas' own policies.

21.     Defendant Stephen Barrows, Defendant Kevin Quinn, and the Board of Trustees subsequently refused to recognize the flagrant violations of Plaintiff's rights and upheld the Judicial Hearing Board's decision to expel Plaintiff from Aquinas College.

22.     Therefore, Plaintiff brings the instant action.

## PARTIES AND JURISDICTION

23.     Plaintiff John Doe ("Doe" or "Plaintiff"), who requests anonymity in this matter as an alleged perpetrator of sexual assault who has never been criminally

charged or investigated, is a resident of Oakland County, Michigan. He will file the appropriate motion for anonymity if necessary and requested by this Court.

24.     Based on the facts detailed below, Defendants will be able to identify Plaintiff and will not be prejudiced by the use of a pseudonym.

25.     Defendant Aquinas College is a private college located in Grand Rapids, Kent County, Michigan.

26.     Defendant Aquinas College Board of Trustees is the governing body of Aquinas College. On information and belief, it oversees and approves Aquinas' written policies, including its Sexual Assault Policy and Procedures.

27.     The events at issue occurred in Grand Rapids, Michigan, which lies in Kent County and the Western District of Michigan.

28.     Defendant Kevin Kwiatkowski is the Director of Campus Safety for Aquinas College. On information and belief, he works and/or resides in Kent County and the Western District of Michigan.

29.     Defendant Stephen Barrows is the Provost of Aquinas College. On information and belief, he works and/or resides in Kent County and the Western District of Michigan.

30.     Defendant Kevin Quinn is the President of Aquinas College. On information and belief, he works and/or resides in Kent County and the Western District of Michigan.

31.     Defendants Sandy Harley, Thad Salter, and Heather Quakenbush comprised the Judicial Hearing Board ("JHB" or "Board"). On information and belief, they each work and/or reside in Kent County and the Western District of Michigan.

32.     This Court has general federal question jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff brings his claims pursuant to Title IX of the Civil Rights Act of 1964, 20 U.S.C. § 1681 *et seq*. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state law claims.

33.     Venue is proper in this Court because Defendants obligated themselves to Plaintiff within the Western District of Michigan, the College is located within the Western District of Michigan, and, upon information and belief, Defendants reside within the Western District of Michigan.

## GENERAL ALLEGATIONS

### A.    Background

34.     Prior to matriculating at Aquinas College, Plaintiff attended a private boy's high school, Orchard Lake St. Mary's, in Orchard Lake, Michigan. There, Plaintiff was an excellent student and hockey player and had no disciplinary record.

35.     He earned an academic scholarship to attend Aquinas, was offered a place on the College's hockey team, and was excited to begin his collegiate experience as both a student and athlete.

36.     In or about August 2016, Plaintiff began freshman orientation at Aquinas College. As a hockey player for the College, Plaintiff arrived on campus one day earlier than the general student population on or about August 17, 2016.

37.     On or about August 19, 2016, Plaintiff attended a school dance with another student, Witness 1 ("W1"), whom he had met during orientation. During the dance at approximately 9:30 p.m., Plaintiff decided that he no longer wanted to be with W1 and, to avoid hurting her feelings, made an excuse to leave. He told W1 that he was going to his room to get something and would come back to the dance.

38.     While Plaintiff was walking back to his room, he overheard someone behind him say, "Hey, what's up?" Plaintiff assumed the person was talking to him and turned around and said, "Hey."

39.     Plaintiff realized that he did not actually know the person he was talking to, and the people behind him were not actually talking to him but to someone else on the phone.

40.     The individuals behind him were Jane Roe ("Roe") and her roommate ("Roommate"). Prior to that moment, Plaintiff had never met Roe or Roommate.

9

41.     The three of them laughed about Plaintiff's mistake and introduced themselves.

42.     It turned out that the Plaintiff, Roe, and Roommate lived in the same dormitory and were all going there, so they started walking together, making small-talk along the way.

43.     As they approached the dormitory, Roommate asked Plaintiff whether he had any alcohol. He did and invited Roommate and Roe to his room for drinks.

44.     They accepted the invitation and went to Plaintiff's room.

45.     Once there, Plaintiff poured two shots of alcohol—one for Roe and one for Roommate—but did not consume any alcohol himself.

46.     Roe and Roommate each consumed about three shots of flavored vodka over a forty-five (45) minute period. After that forty-five (45) minute period, neither Roe nor Roommate consumed any more alcohol in Plaintiff's presence that night.

47.     While Roe and Roommate were drinking, Plaintiff was dealing with W1, who continuously called and texted Plaintiff wondering where he was and why he had not returned to the dance.

48.     Plaintiff informed W1 that he had gone back to the dormitory and did not plan on returning to the dance.

49.     When W1 kept calling anyway, Roommate took the phone from Plaintiff and told W1 to stop calling Plaintiff. In response, W1 stated that she planned to come to Plaintiff's room.

50.     Plaintiff did not want to see W1, so Plaintiff went with Roe to her room while Roommate waited in Plaintiff's room for W1 to tell her that Plaintiff did not want to see her.

51.     While Plaintiff was in Roe's room, W1 continued to call and text Plaintiff. As it was clear that she would not stop, Plaintiff eventually agreed to meet W1 outside of the dormitory.

52.     Roe and Roommate went with Plaintiff to confront W1, and Roe pretended to be Plaintiff's ex-girlfriend from high school. They informed W1 that they had decided to start dating again, and after a while, W1 finally left.

53.     At that point, Plaintiff, Roe, and Roommate left the dormitory together in an effort to find a party. While walking, they ran into another student, Witness 2 ("W2"), who knew Roommate. They asked W2 whether he knew of any parties, but he did not.

54.     Around 11:30 p.m., Plaintiff, Roe, and Roommate decided to go back to Roe and Roommate's room, and W2 left.

55.     Once there, Roommate informed Plaintiff and Roe that she was going to leave to go to her boyfriend's.

56.     Roe told Roommate that she should not have sex with her boyfriend. Roommate responded that she would not have sex with her boyfriend if Roe did not have sex with Plaintiff. Roommate stated this pact was more of a joke because she knew Roe wanted Plaintiff to spend the night with her.

57.     After that, Roommate left, and Plaintiff continued talking with Roe.

58.     Around 11:45, Roe sent a Facebook friend request to Plaintiff.

59.     Around midnight, Roe said she was going to get ready for bed. She went to the bathroom and returned wearing nothing but her bra and underwear.

60.     She invited Plaintiff to stay with her for the night.

61.     Plaintiff offered to sleep in Roommate's bed, but Roe said she did not know if Roommate would like that and that Plaintiff should sleep in her bed.

62.     Roe then asked Plaintiff to give her a kiss goodnight.

63.     Plaintiff and Roe began kissing.

64.     Plaintiff voiced that they did not need to have sex that night and reminded Roe that she had promised Roommate that she would not have sex with him. Roe responded that it was okay if they had sex since she knew Roommate would have sex with her boyfriend.

65.     After that, Plaintiff and Roe engaged in consensual sex.

66.     Roe actively participated in sexual activities, willingly performing fellatio and engaging in penetrative sex in multiple positions, including a female dominant position.

67.     At no point did Roe tell Plaintiff "no" or to stop.

68.     At all times, Roe actively participated in the sexual encounter and was coherent.

69.     When they were finished, Roe gave Plaintiff her room key and asked Plaintiff to return in the morning.

70.     Plaintiff came back around 6:30 a.m. and got into bed with Roe and went back to sleep for a little while.

71.     Roe never asked Plaintiff to leave.

72.     Roe got up, showered, dressed, and left for orientation activities.

73.     Plaintiff returned to his room, decided he was still tired, and informed his orientation leader that he would not be attending orientation activities. The orientation leader stated that was fine so long as Plaintiff attended the activities beginning at 7 p.m.

74.     Plaintiff went back to sleep for a while, went to get something to eat, and then returned to Roe's room to get his backpack, which he had left the night before. Roe was not there, but Roommate was there with her boyfriend. Plaintiff began talking to Roommate and her boyfriend and admitted that he had had sex

with Roe the night before. He also informed Roommate that he would like to date Roe. Roommate told Plaintiff that she needed to take a shower, so Plaintiff left.

75.     After that, because he was interested in dating her, Plaintiff attempted to contact Roe, but she never responded. Plaintiff assumed that Roe was not interested in seeing Plaintiff again and stopped trying to contact her.

76.     At all times relevant hereto on August 19, 2016, Roe was awake and alert. She was coherent, able to walk on her own, and fully functional.

77.     At the time Plaintiff and Roe had sex, Roe was not incapacitated and gave knowing consent for their sexual encounter. In fact, she initiated sex with Plaintiff.

**B.     Investigation**

78.     More than eight months later, on or about April 26, 2017, Plaintiff received a Campus No-Contact Order from Defendant Kevin Kwiatowski ordering him to have no further personal contact or communication with Roe. Furthermore, Plaintiff was directed to remain at least fifteen (15) feet from Roe at all times and at any location on or off Aquinas property. Kwiatkowski warned that non-compliance could result in further actions, including administrative withdrawal from the College.

79.     Plaintiff was shocked as he had not even attempted to contact Roe since around September 1, 2016 and did not understand the reason for the No-Contact Order.

80.     On or about May 3, 2017, Associate Vice President of Student Affairs, Brian Matzke, emailed Plaintiff notifying him that he had been accused of sexual assault.

81.     Under Aquinas' policy, sexual assault is defined as "Any sexual act directed against another person, forcibly and/or against that person's will; or not forcibly or against the person's will where the victim is incapable of giving consent . . . ."

82.     Consent is defined as, "the freely, affirmatively communicated willingness to participate in sexual activity, expressed by words or unambiguous actions."

83.     Furthermore, "Consent may never be obtained . . . if the victim is mentally or physically disabled or incapacitated, including through the use of drugs or alcohol."

84.     Under a separate policy, Aquinas defines mentally disabled as "a person [who] has a mental illness, is intellectually disabled, or has a developmental disability."

85.     Furthermore, a mentally incapacitated person is one who "is rendered temporarily incapable of appraising or controlling his or her conduct due to the influence of a narcotic, anesthetic, or other substance administered to that person without his or her consent, or due to any act committed upon that person without his or her consent."

86.     Aquinas does not define physically disabled or incapacitated.

87.     On or about May 4, 2017, Plaintiff met with Matzke and Kwiatkowski to discuss the allegations against him.

88.     The same day as that meeting, Plaintiff received a Notice of Interview & Investigation informing him of the accusation against him and the College's Sexual Assault Judicial Process.

89.     The Notice also stated that Plaintiff was accused of violating the Behavioral Misconduct and Harassment policy in addition to sexual assault.

90.     Under the Student Conduct Code, Behavior Misconduct and Harassment is defined as:

> [C]ommunication, whether spoken, written, physical, or pictorial, that could reasonably be understood as (1) having the purpose or effect of creating an intimidating, hostile, or offensive environment; (2) having the purpose or effect of interfering with an individual's work or academic performance or access to College activities and programs; or (3) adversely affecting an individual's employment or educational opportunities or access to College activities and programs.

91.     Furthermore:

> Harassment is considered a violation of College policy when it has the purpose or effect of demonstrating disregard for the rights of or respect for others; when it shocks the sensibilities of the average person; or when it occurs after a warning that such communication or behavior is considered offensive.

92.     At the meeting, Plaintiff received Roe's Statement alleging that Plaintiff sexually assaulted her and that she was too drunk to recall what happened on August 19th.

93.     Roe also claimed that Plaintiff had followed her around at orientation activities on August 20th, had constantly tried to contact her after August 19, 2016, and had been showing everyone a photograph of her topless—although she admitted to not seeing the photograph herself.

94.     Plaintiff did not have and has never had a topless photograph of Roe.

95.     He did supply Kwiatowski with a photograph of Roe and Roommate kissing his cheek from August 19th.

96.     And as stated above, Plaintiff did not attend the morning orientation activities on August 20th and made no effort to contact Roe after around September 1, 2016.

97.     Matzke and Kwiatkowski told Plaintiff that he had three business days to respond to Roe's allegations.

98.    After requesting and receiving an extension, Plaintiff submitted his statement to Matzke on or about May 11, 2017, which was forwarded to Kwiatkowski.

99.    The College assigned Kwiatkowski as the Investigator into Roe's allegations against Plaintiff.

100.   On information and belief, Roe's mother is an alumna of Aquinas College.

101.   On information and belief, Kwiatkowski is an alumnus of Aquinas College and personally knew Roe's mother who attended the College at the same time, which he never disclosed.

102.   During the initial meeting to discuss the complaint with Matzke and Kwiatkowski, Kwiatkowski stated to Plaintiff's parents that it has been his experience that "women do not make these allegations unless they are true".

103.   Under Aquinas' policy and Title IX, the investigator must be neutral. Yet, as outlined below, Kwiatkowski performed a biased investigation in which he credited Roe and discredited Plaintiff in violation of Title IX and Aquinas' policies.

104.   Ultimately, Kwiatkowski's Investigative Report included a determination that Plaintiff was responsible and that Roe's versions of the events were more credible.

105.   Yet, under Aquinas Policy, the Report should not have contained ***any*** conclusions or credibility determinations, ***only*** the facts that Kwiatkowski gathered.

106.   As outlined below, the Investigative Report was critical to the College's ultimate findings.

107.   On or about May 26, 2017, Plaintiff received notice from the Athletic Director that he was suspended indefinitely from the hockey team.

108.   On or about June 5, 2017, Kwiatkowski interviewed Plaintiff to get his version of the events.

109.   During this interview, along with additional documentary evidence, Plaintiff submitted an Instagram photo posted on August 20, 2016, the day after the incident. The photo shows Roe and Roommate enjoying themselves, and Roe has no visible bruising.

110.   On or about June 22, 2017, Kwiatkowski emailed Plaintiff the completed "transcript" of his June 5th interview to review and correct, if needed.

111.   On or about July 5, 2017, Plaintiff submitted his corrected statement from the interview to Kwiatkowski along with additional documentary evidence, including a polygraph report.

112.   The polygraph was completed on or about June 27, 2017 by Christopher Lanfear, a highly regarded examiner who was a polygraph examiner

19

and instructor for the Michigan State Police and the Oakland County Sheriff's office for over forty (40) years.

113.   Plaintiff was subjected to four hours of personally invasive questions.

114.   Mr. Lanfear determined that Plaintiff truthfully answered all questions asked, including but not limited to:

     a.   Q. Are you lying about even one of the events you said occurred with [Roe]? A. No.

     b.   Q. Did you force [Roe] in any way to accomplish having sex with her? A. No.

     c.   Q. Did you engage in sex with [Roe] while she was incapacitated in any way? A. No.

     d.   Q. Did you serve [Roe] more than one drink that night? A. No.

115.   On or about July 21, 2017, Plaintiff received a Notice of Title IX Hearing, informing him that the investigation had concluded, the Judicial Hearing Board ("JHB" or "Board") had reviewed the Investigative Report, and the Board determined that a hearing should be scheduled to address the charges of sexual assault and harassment against Plaintiff.

116.   On or about the date Plaintiff received notice of the hearing, Plaintiff requested a copy of the Investigative Report and witness statements to prepare for the hearing.

117.   Plaintiff, however, was denied the opportunity to review the Investigative Report. It was only after the hearing and Plaintiff's expulsion that he was able to review the Investigative Report under a FERPA request.

118.   While he was denied access to review it prior to the hearing, Plaintiff later learned that Kwiatkowski's Investigative Report includes a conclusion that there were excerpts from interviews that provide a preponderance of the evidence standard to support Roe's claim. The "excerpts" pertained to the amount of alcohol Roe alleged that she consumed, ignoring all contradictory witness statements and other evidence, including Plaintiff's polygraph report.

119.   Moreover, there was a copy of a drink chart and several calculations from on-line Blood Alcohol Content ("BAC") calculators from which Kwiatkowski concluded, "Ms. Complainant [Roe] would be at best impaired but most likely intoxicated based on above." There was no indication, based on the charts, that Roe would have been incapacitated.

120.   The "Analysis" in the Investigative Report stated:

Based on personal interviews of the Complainant [Roe] and [Plaintiff] and numerous witnesses, for both the Complainant and Respondent, *it is apparent* that the Complainant was in a vulnerable state due to alcohol provided by (Plaintiff) on 8/19/16.

(emphasis added)

121.   Furthermore, the Investigative Report contained a "conclusion" in which Kwiatkowski wrote:

> *It is my consideration* that there is sufficient evidence for this matter
> to proceed within the policies and procedures regarding student
> conduct at Aquinas College. *It is my opinion* that the Complainant
> was not able to provide consent based on alcohol consumption.

(emphasis added)

122.   Yet, Aquinas' Sexual Assault Policy states, "The investigator prepares a written summary of the evidence. *The summary is limited to facts and does not contain conclusions or credibility determinations*." (emphasis added)

123.   Although Kwiatkowski should not have made *any* conclusions or credibility determinations, the conclusions and credibility determinations he made are not even supported by the evidence presented.

124.   While preparing for the hearing, Plaintiff learned that Roe had initially raised allegations against him in December 2016.

125.   Kwiatkowski was aware of and had access to Roe's December 2016 allegations.

126.   At that time, a Resident Assistant ("RA") overheard a resident talking about Roe allegedly being sexually assaulted the first week of school.

127.   The RA asked to talk with the accuser (Roe), and when confronted, Roe told the RA that she (Roe) had heard from other residents that Plaintiff had assaulted her but had no memory of it.

128.   Aquinas did not open an investigation at that time, and Plaintiff was never informed of the allegation nor given an opportunity to respond.

129.   Plaintiff, however, did not receive any detail regarding the December 2016 allegations until *after* the hearing when he was able to view his educational file through a request under FERPA.

130.   Prior to the hearing date, Defendants only permitted Plaintiff one hour to review two investigative interviews of Roe, ten (10) witness statements, and other evidence. He could not copy, take photos of, or record the documents in any way.

131.   The material Plaintiff could review did *not* contain a copy of the Investigative Report or any statements from Roe or the RA regarding the allegations made by Roe in December 2016.

132.   On or about August 3, 2017, Plaintiff asked if any additional witness statements had been taken since his review on July 26th. He was then informed that there were two more interviews with witnesses and that he could review them in-person prior to the hearing.

133.   On the same date, Plaintiff again asked to review a copy of the Investigative Report and any documentation regarding the initial allegations by Roe to the College in December 2016, including the RA's statement. Access to both was again denied.

134.   On or about August 8, 2017, Plaintiff reviewed the two additional witness statements. In addition to the new witness statements, there was a copy of

23

a screenshot of Roe's phone showing a "missed call" from Plaintiff on March 24, 2017 and a copy of a prescription medication list supplied by Roe.

135.   Although not referred to, or referenced in any of the interviews with Roe, the prescription list for the "date of service" of August 27, 2016 (eight days after the alleged assault) showed a prescription for Citalopram, an anti-depressant. When asked at the hearing if this prescription was a refill, Roe's answer was "yes".

136.   The prescription list also showed a prescription for Microgestin 1/20, a *monthly* birth control prescription. This contradicts what Roe stated in her second interview with Kwiatkowski that she had been on a *three-month* birth control prescription in August 2016.

137.   By reviewing the witness statements, Plaintiff was also able to learn that Roommate's statement to Aquinas corroborated much of Plaintiff's versions of the events.

138.   According to Roommate, she left to go to her boyfriend's because she thought that Roe was interested in Plaintiff and that she thought they would likely have sex. She did not want to be in the room when it happened.

139.   She admitted that Roe was flirting with Plaintiff.

140.   She also stated that Roe was capable of saying "no" if she did not want to have sex with Plaintiff that night.

141.   Roommate told Kwiatkowski that Roe was not proud of what happened and regretted having sex with Plaintiff but did not tell her that she was sexually assaulted.

142.   Roommate did not recall seeing any bruising on Roe on August 20, 2016.

143.   Finally, according to Roommate, she and Roe discussed details of the sexual relations between Roe and Plaintiff on August 20, 2016, including that Roe and Plaintiff had sex multiple times that night and the size of Plaintiff's penis.

144.   W2 also gave a statement to Kwiatkowski.

145.   According to W2's statement, Roe was capable of walking on her own and was not too drunk to function.

146.   Plaintiff also found witness statements from multiple individuals who were not with Roe or Plaintiff that night, several of which, including Roe's boyfriend at the time of the investigation, relied solely on hearsay.

147.   One of the hearsay statements contained a redacted paragraph.

148.   Plaintiff was denied an opportunity to review an unredacted copy of this statement.

149.   On information and belief, the unredacted copy contained a reference to a different sexual encounter, which on information and belief, was supplied to the JHB.

150.  Under Aquinas' policy, however, Plaintiff had a right to not have his irrelevant past conduct, including sexual history, considered in the JHB's decision.

151.  Statements from Roe's suitemates confirm that they both recalled Roe being coherent and with Plaintiff on the night of August 19th when one asked Roe if she could use the shower. Both suitemates witnessed Roe and Plaintiff alone above the covers and dressed. Roe made no verbal or non-verbal indication that she wanted to leave or that she wanted Plaintiff to leave.

152.  Furthermore, from Plaintiff's review of various statements Roe had given Aquinas, it became clear that her story was inconsistent. Her inconsistent statements include, but are not limited to:

   a.  In her first statement, Roe could not recall how many shots she had, but in her second statement, she recalled having at least three shots before drinking out of the bottle;

   b.  Roe initially could not recall who allegedly carried her on the way back from an alleged party, but in her second statement, she claimed she recalled Plaintiff carrying her;

   c.  Roe initially claimed that after returning from the alleged party, the rest of the night was a blur, but in her second statement, she recalled going to the dorm room with Roommate, Roommate leaving for her boyfriend's, and Plaintiff getting into bed with her; and

26

d. In her first statement, Roe could not recall anything about having sex with Plaintiff, but she later claimed that she remembered touching Plaintiff's necklace while they were having sex.

153.   Roe was the *only* witness with first-hand knowledge who testified that anyone involved went to a party that night. In fact, Plaintiff, Roommate, and W2 all denied attending any party.

154.   Additionally, when Roe first accused Plaintiff of any misconduct in December 2016, she claimed she was off-campus when Plaintiff gave her a lot of alcohol. She then claimed that she "blacked out," and she heard from other students that Plaintiff had assaulted her. She had no independent recollection of an alleged assault and stated she was okay.

155.   Yet, as outlined above, Roe later claimed to remember some details of what happened on August 19, 2016.

156.   Furthermore, as outlined above, Roommate's statement contradicts Roe's. Roommate stated that Roe was flirting with Plaintiff, was capable of saying "no," and discussed details of the sexual encounter with Plaintiff the next day, but never claimed that Plaintiff assaulted her and showed no bruising.

157.   In regard to the harassment charges involving an alleged topless photograph that Roe claimed Plaintiff had of her, of the twelve (12) witnesses

27

interviewed, only *one* claimed to have seen the photo. And when asked to describe it, the witness' description made it clear that the photo was not of Roe.

158.   Plaintiff was not given the opportunity to respond to any of the witness statements prior to the hearing.

159.   Defendants denied Plaintiff access to Roe's and the RA's December 2016 statements prior to the hearing.

160.   Defendants denied Plaintiff access to the investigation summary report prior to the hearing.

161.   Plaintiff was not given the opportunity to respond to any of the findings of the Investigative Report prior to the hearing as he was denied access to it.

162.   Aquinas initially denied Plaintiff's request to allow the individual who took his polygraph exam to testify as a witness at the hearing, but later allowed it after Plaintiff asked for reconsideration.

**C.    Hearing**

163.   The hearing took place on or about August 8, 2017.

164.   Defendants did not disclose the identity of the Judicial Hearing Board ("JHB" or "Board") Members prior to the hearing.

165.   Per current Aquinas policy, "In the event a matter is scheduled for hearing, the parties will be provided reasonable opportunity to review statements and evidence as provided in the General Provisions in preparation for the hearing."

166.   As discussed above, prior to the hearing, Plaintiff was given only one hour to review two interviews with his accuser, ten (10) separate witness statements, and other evidence from the investigation and was not permitted to receive a copy.

167.   Aquinas policy states, "The complainant has the right to be visibly shielded from the view of the accused during the hearing."

168.   Here, Aquinas placed a curtain between Plaintiff and Roe so that Plaintiff and Roe could not see each other.

169.   Aquinas policy also states:

> The complainant and accused may only ask questions to each other through a member of the Judicial Hearing Board, unless they consent to direct questioning by each other. The Judicial Hearing Board shall have control of the hearing, and may make such procedural rulings as it deems necessary to assure the fairness and efficiency of the proceedings. This may include extending the hearing to allow other identified witnesses to testify.

170.   As a result, Plaintiff had no opportunity to cross-examine witnesses, including but not limited to his accuser, or to engage in discovery.

171.   No transcript was made of the hearing testimony.

29

172.   The hearing was scheduled to last an hour total, but the Judicial Hearing Board limited it to fifty (50) minutes without explanation.

173.   Plaintiff was given an opportunity to read a prepared statement in which he denied, and continues to deny, the allegations made against him. In his statement, Plaintiff raised the concerns with Roe's accusations as outlined above.

174.   Roe chose not to give a statement. She only answered the questions the Judicial Hearing Board posed to her.

175.   During the hearing, Roe admitted that Plaintiff had not talked to her throughout 2017 and only presented one (1) screenshot showing a missed call from Plaintiff in March 2017.

176.   Plaintiff's phone records do not show him calling Roe in March 2017.

177.   When asked by the Board about her conversation with her roommate the next morning, Roe did not deny talking about having sex with Plaintiff, or the size of Plaintiff's penis, but instead stated she "did not mean it in a complimentary way." She did not say that she did not remember having sex or had "blacked out."

178.   The Board only asked Plaintiff three to five questions.

179.   One of the questions was whether Plaintiff ever referred to Roe as his "trophy girl." His response was "no."

180.   Even before Plaintiff spoke, he knew that the Judicial Hearing Board would find him responsible.

181.   The Board was uninterested in the polygraph results, and only one Board member took notes.

182.   The Board did not recall any of the witnesses interviewed by Kwiatkowski and, on information and belief, relied solely upon Kwiatkowski's Investigative Report and findings, despite being instructed not to do so.

183.   On or about August 14, 2017, Plaintiff received notice that he had been found responsible of sexual assault and behavioral misconduct and harassment by a preponderance of the evidence standard.

184.   As a result, Plaintiff was expelled from Aquinas College.

185.   The Judicial Hearing Board provided no rationale for its decision, and Aquinas refused to disclose the rationale if the Board's decision was unanimous.

186.   In reality, the Board reached an erroneous conclusion based solely on Plaintiff's gender rather than the preponderance of evidence before the Board, in direct violation of Aquinas' policies and Title IX.

**D.    Appeal**

187.   On or about August 19, 2017, Plaintiff appealed the decision to Provost Barrows.

188.   The basis of the appeal was the same as above: that there was not a preponderance of the evidence showing he committed the offenses alleged against

him; that he was given inadequate opportunity to defend himself; and the expulsion was too severe a penalty.

189.   Plaintiff also pointed out that he had never received a copy of the December 2016 complaint and the Investigative Report.

190.   On or about August 30, 2017, Plaintiff received notice that the appeal was denied.

191.   Provost Barrows determined that it was not erroneous for the Judicial Hearing Board to fail to consider Roe's complaint in December 2016, reasoning that her 2016 Statement was a "pre-process" document prepared by an RA.

192.   He did not explain how a prior inconsistent statement by Roe would be irrelevant when determining her credibility.

193.   He did not comment at all about Plaintiff being denied access to the Investigative Report prior to the hearing.

194.   Following the appeal, Plaintiff was finally able to review Kwiatkowski's Investigative Report, including Kwiatkowski's erroneous conclusion that there was sufficient evidence to conclude that Roe was unable to provide consent based on the amount of alcohol she allegedly consumed.

195.   Yet, as stated above, Aquinas' Sexual Assault Policy states, "The investigator prepares a written summary of the evidence. ***The summary is limited***

*to facts and does not contain conclusions or credibility determinations*." (emphasis added)

196. The JHB used the Investigative Report in reaching its decision.

197. Kwiatkowski's actions were in contravention of Aquinas' policies and Title IX.

198. Once Plaintiff learned this new information, he appealed the Provost's decision to President Kevin Quinn, on or about December 22, 2017.

199. Plaintiff raised the same issues listed above in his appeal.

200. Like Provost Barrows, President Quinn denied the appeal on or about February 22, 2018.

201. President Quinn did not provide a rationale for his conclusions.

**E.    Inherent Bias**

202. In addition the inherent biases in Aquinas' processes and procedures, *see infra*, the investigation into Plaintiff was inherently bias because of his gender.

203. On information and belief, Kwiatkowski is an alumnus of Aquinas College and personally knew Roe's mother who attended the Aquinas College at the same time as Kwiatkowski. He never disclosed this.

204. During the initial meeting to discuss the complaint with Matzke and Kwiatkowski, Kwiatkowski stated to Plaintiff's parents that it has been his experience that "women do not make these allegations unless they are true".

33

205.   Upon information and belief, one of the members of the Judicial Hearing Board, Sandy Farley, was previously employed from 1997-1999 by R.A.V.E., a support group predominately for **women** against domestic violence and sexual assault.

206.   From 2013-2016, there have been nineteen (19) allegations of "rape" at Aquinas College. On information and belief, all of these instances were allegedly perpetrated by males, and all were expelled.

207.   Furthermore, Aquinas' Sexual Assault Policy, on its face, is meant to support accusers, rather than both the accuser and the accused:

> Aquinas College is committed to fostering an environment in which all members of our campus community are safe, secure, and free from sexual misconduct of any form. Sexual assault, domestic violence, dating violence, and stalking violate the standards of conduct expected of every member and visitor within the College community and are strictly prohibited, as do related offenses such as sexual misconduct and sexual exploitation as defined by this policy.

> This policy provides guidance concerning nature of such violations, as well as the educational, support, reporting, and disciplinary procedures for such violations.

208.   On information and belief, Aquinas knew, when it wrote the Policy, that nearly all of the individuals who are accused of sexual misconduct are men, and nearly all of their accusers are women. Thus, it understood that the Policy, as written, is more protective of women than men.

209.   On information and belief, Defendant Board of Trustees reviewed and authorized the Policy in its current form.

210.   On September 22, 2017, the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE") put in place an interim guidance while the current administration reviews and revises its practices with regard to the adjudication of complaints of sexual misconduct on college campuses receiving federal funding. See, e.g., https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct.

211.   The interim guidance and review suggests that the practices in place at all times relevant to this lawsuit were unfair and, ultimately, out of step with the goal of gender equity in Title IX-related proceedings. See "Q&A on Campus Sexual                         Misconduct,"                         available                         at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

212.   For example, the new OCR guidance, in a significant departure from the 2011 Dear Colleague Letter, states: "The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard," as long as the standard for evaluating claims of sexual misconduct is the same as that applied in other student disciplinary proceedings.

35

213. Significantly, the new OCR guidance also requires that "Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms."

214. It further states:

[T]he decision-maker(s) must offer each party the same meaningful access to any information that will be used during informal and formal disciplinary meetings and hearings, ***including the Investigative Report. The parties should have the opportunity to respond to the report in writing in advance of the decision of responsibility and/or at a live hearing to decide responsibility***."

(emphasis added)

215. The Policy to which Plaintiff was subject, at least as to the process by which the claims against him were adjudicated, sets forth the procedures by which Aquinas students like Plaintiff, who have been accused of violating one or more of the enumerated offenses, are investigated, heard and, possibly, disciplined.

216. Although Aquinas promised Plaintiff certain above-described process rights under the Policy, Defendants nevertheless treated him in a manner that clearly violated his rights under the Policy and Title IX, as set forth more fully below.

## COUNT I
## <u>VIOLATION OF TITLE IX</u>

217. Plaintiff incorporates all preceding paragraphs above as though fully stated herein.

36

218. Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

219. Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendant Aquinas College.

220. Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.

221. Title IX claims arising from collegiate disciplinary hearings are generally analyzed under two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "severity of penalty/selective initiation" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

222. Both an "erroneous outcome" and an "unjustly severe penalty" occurred in this case.

37

223.   Plaintiff was innocent and wrongly found to have committed a violation of Aquinas' Sexual Assault Policy, and gender bias was a motivating factor.

224.   Aquinas imposed an unwarranted and excessive sanction on Plaintiff as a result of an erroneous outcome reached by a flawed disciplinary process, and gender bias was a motivating factor.

225.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the ***prompt and equitable resolution*** of student . . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.

226.   The "prompt and equitable" procedures that a school must implement include, at a minimum:

    a.   "Notice . . . of the procedure, including where complaints may be filed";

    b.   "Application of the procedure to complaints alleging [sexual] harassment . . .";

    c. "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

    d. "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

    e. "Notice to the parties of the outcome of the complaint . . . ."

227. Furthermore, under 20 U.S.C. § 1092(f)(8)(B)(iv):

Procedures for institutional disciplinary action in cases of alleged domestic violence, dating violence, sexual assault, or stalking, which shall include a clear statement that—

(I) such proceedings shall—

(aa) provide a prompt, fair, and impartial investigation and resolution . . . .

228. The regulations for Title IX further clarify:

A prompt, fair, and impartial proceeding includes a proceeding that is–

(A) Completed within reasonably prompt timeframes designated by an institution's policy, including a process that allows for the extension of timeframes for good cause with written notice to the accuser and the accused of the delay and the reason for the delay;

(B) Conducted in a manner that-

(1) Is consistent with the institution's policies and transparent to the accuser and accused;

(2) Includes timely notice of meetings at which the accuser or accused, or both, may be present; and

(3) Provides timely and equal access to the accuser, the accused, and appropriate officials to any information that will be used during informal and formal disciplinary meetings and hearings; and

(C) Conducted by officials who do not have a conflict of interest or bias for or against the accuser or the accused.

34 C.F.R. § 668.46(k)(3)(i).

229.   And "the result must also include the rationale for the result and the sanctions." 34 C.F.R. § 668.46(k)(3)(iv).

230.   Based on the foregoing, Defendants failed to conduct an adequate, reliable, and impartial investigation of Roe's complaint.

231.   Aquinas College failed to provide any rationale for its decision. The Judicial Hearing Board simply stated that Plaintiff was responsible under a "preponderance of the evidence" standard.

232.   Additionally, Defendants entirely failed to state what evidence they relied on or what evidence they considered in reaching their conclusion.

233.   Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose an unjustly severe penalty upon Plaintiff.

234.   As described above, these circumstances include:

   a. From the outset, the investigation was slanted in favor of the female complainant;

b. The investigator, Kwiatkowski, conducted his investigation and used investigative techniques in a manner designed to attempt to credit the female complainant's version of events and to discredit the male respondent's version of events;

c. Kwiatkowski admitted to Plaintiff's parents that he believed women do not make allegations of sexual assault unless they are true;

d. On information and belief, Kwiatkowski failed to disclose his bias and prior acquaintance with Roe's mother;

e. Kwiatkowski failed to account for Roe's December 2016 statement and ignored Roe's inconsistent statements;

f. Kwiatkowski ignored witness statements that credited Plaintiff's account of the events and discredited Roe's accounts of the events;

g. Kwiatkowski accepted the complainant's statements at face value, despite the lack of corroboration for many of her assertions and the inconsistent statements she had made;

h. In contravention of Aquinas's policies, Kwiatkowski provided the JHB with his own conclusions, including that there was allegedly a preponderance of the evidence to show that Plaintiff sexually assaulted Roe;

     i.  Kwiatkowski and the JHB ignored Plaintiff's polygraph report and the well-renowned polygrapher's testimony that Roe was not incapacitated at the time of the alleged assault; and

     j.  The JHB, Provost, and President reached a final decision that was directly at odds with the reliable and credible evidence they had, and at odds with Aquinas's policies concerning consent and incapacitation. The explanation for their determination is bias against Plaintiff, a male student.

235.  Further, the JHB essentially adopted Kwiatkowski's gender-biased treatment of the case and did so with procedures in which there is: no cross-examination; no sworn testimony; no provision for the respondent to have the opportunity to confront and question his accusers or witnesses against him—in fact, a physical barrier is placed between the accuser and the accused so that the accused cannot see the accuser; no provision for respondent to have the opportunity to call witnesses in support of his defense before a fair and impartial decision-maker without Defendants' prior approval; and no presumption of innocence but rather a presumption that the female's accusations are true and no reasoned consideration of evidence as required by a burden of proof.

236.  Further, Aquinas has created an environment where an accused male student is denied basic fairness and due process on the basis of sex.

237.   Aquinas's Sexual Assault Policy demonstrates its gender-biased practices with respect to respondents, who are almost invariably male students, accused of sexual misconduct.

238.   Specifically, without limitation, the Sexual Assault Policy:

   a.   Was promulgated to provide recourse for complainants, the vast majority of whom are female, rather than to protect both parties throughout the process from unfair and inequitable treatment;

   b.   Contains support resources and accommodations designed specifically *for complainants*, the vast majority of whom are female, but contains no comparable support resources and accommodations for respondents, the vast majority of whom are male;

   c.   Provides a non-retaliation provision for complainants, the vast majority of whom are females, but contains to comparable provision for respondents, the vast majority of whom are male; and

   d.   States that the purpose of the policy is to ensure "the campus community [is] safe, secure, and free from sexual misconduct of any form" with no statement regarding safeguarding the accused from false accusations.

239.   Based on the foregoing, the Aquinas College Sexual Assault Policy is inherently discriminatory against male students accused of misconduct. The Policy fails to ensure a fair and impartial investigation and hearing process.

240.   Moreover, Defendants applied these policies and procedures and gender-biased practices in a manner that discriminated against Plaintiff on the basis of his sex and led to an erroneous and adverse outcome.

241.   Defendants also imposed an unjustly severe penalty on Plaintiff, and they did so on the basis of his gender.

242.   Defendants imposed a sanction of expulsion despite the fact that Aquinas's policies explicitly state that there are other disciplinary options for students found responsible for a non-consensual sexual act.

243.   On information and belief, Defendants imposed this unjustified sanction in an effort to appease campus victims' rights advocates.

244.   Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him (the male) responsible for sexual assault and be punished severely for it.

245.   This unlawful discrimination in violation of Title IX proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and

future economic loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects.

246.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT II
## BREACH OF CONTRACT

247.   Plaintiff incorporates all preceding paragraphs above as though fully stated herein.

248.   Plaintiff applied to and enrolled in the College and signed a scholarship agreement and paid associated fees and expenses.

249.   Plaintiff did so in reliance on the understanding and with the reasonable expectation that the College would implement and enforce the provisions and policies set forth in its official publications, including the Sexual Assault Policy.

250.   An express contract or, alternatively, a contract implied in law or in fact was formed between Plaintiff and the College.

251.   The contract contained an implied covenant of good faith and fair dealing. It implicitly guaranteed that any proceedings would be conducted with basic fairness.

252.  Based on the aforementioned facts and circumstances, Defendants breached express and/or implied agreement(s) with Plaintiff, and the covenant of good faith and fair dealing contained therein.

253.  Defendants committed several breaches of their agreements with Plaintiff during and after the investigation process, falling outside the range of reasonable expectations of one reading Aquinas' policies. *See Faparusi v. Case W. Reserve Univ.*, 2017 U.S. App. LEXIS 19593, at *17-19 (6th Cir. Oct. 4, 2017); *Finch v. Xavier Univ.*, 689 F. Supp. 2d 955, 968-69 (S.D. Ohio 2010).

254.  For example, Defendants breached their agreement with Plaintiff when they failed to utilize the preponderance of the evidence standard in reaching their decision per Aquinas' policy.

255.  Had Defendants done so, they would have reached the opposite conclusion; namely, that Plaintiff was not responsible for the misconduct alleged.

256.  Based on the above, a fair reading of the evidence reveals that Roe's account of the events lacked any corroboration or reliability. Yet Plaintiff was inexplicably deemed less credible.

257.  Based on the above, a fair reading of the evidence reveals that Roe was not incapacitated by alcohol and did not lack the ability to consent.

258.   Defendants thus breached their contract with Plaintiff, and the covenant of good faith and fair dealing contained therein, when they failed to utilize and apply the requisite preponderance of the evidence standard.

259.   Defendants failed to provide a supportable rationale for their decision.

260.   In contravention of Aquinas' policy, Kwiatkowski's Investigative Report includes a conclusion that there were excerpts from interviews that provide a preponderance of the evidence standard to support the Complainant's (Roe's) claim. The "excerpts" pertained to the amount of alcohol Roe allegedly consumed, ignoring all contradictory witness statements and Plaintiff's polygraph report.

261.   Furthermore, the Investigative Report contained a "conclusion" in which Kwiatkowski wrote:

> **It is my consideration** that there is sufficient evidence for this matter to proceed within the policies and procedures regarding student conduct at Aquinas College. **It is my opinion** that the Complainant was not able to provide consent based on alcohol consumption.

(emphasis added)

262.   Yet, Aquinas' Sexual Assault Policy states, "The investigator prepares a written summary of the evidence. **The summary is limited to facts and does not contain conclusions or credibility determinations**." (emphasis added)

263.   The JHB used the Investigative Report in reaching its decision.

264.   Defendants' denied access and an opportunity to respond to the Investigative Report.

47

265. Had the JHB not considered Kwiatkowski's erroneous findings, it would not have reached the same conclusion.

266. Accordingly, Defendants breached their contract with Plaintiff, and the covenant of good faith and fair dealing contained therein, when they relied on an Investigative Report that violated Aquinas' Sexual Assault Policy to reach their decision.

267. As a direct and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, without limitation, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

268. Plaintiff is entitled to recover damages for Defendants' breaches of the express and/or implied contractual obligations described above in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT III**
**BREACH OF CONTRACT: DENIAL OF BASIC FAIRNESS/**
**ARBITRARY AND CAPRICIOUS DECISION MAKING**

269. Plaintiff incorporates all preceding paragraphs above as though fully stated herein.

270.   Defendants had a duty, either under an express or implied contract or as a matter of common law, to ensure that the proceedings against Plaintiff were conducted with basic fairness.

271.   Defendants breached this duty of basic fairness by, without limitation:

a.   Failing to provide Plaintiff with the same protections explicitly afforded the complainant under Aquinas's Sexual Assault Policy, including, without limitation, the right to policies and procedures designed to protect the rights of *both* complainants and respondents; and the right to a presumption of innocence unless and until the preponderance of evidence warrants a finding of responsibility;

b.   Failing to provide Plaintiff the opportunity to review the Investigative Report and respond to its findings;

c.   Failing to provide Plaintiff the opportunity to confront and question witnesses at a fair hearing;

d.   Arbitrarily and capriciously finding that the complainant was incapacitated and unable to consent when the preponderance of evidence unquestionably showed that the complainant was neither incapacitated nor unable to consent; and

e.  Arbitrarily and capriciously expelling Plaintiff when Aquinas's Policy explicitly provides for alternate discipline after a finding of a non-consensual sexual act.

272.  Defendants' breach of the duty to ensure basic fairness proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

273.  As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT IV**
**PROMISORY ESTOPPEL**

274.  Plaintiff incorporates all preceding paragraphs above as though fully stated herein.

275.  As described above, Aquinas College's policies constitute a promise that Defendants will act in a manner described within them. Defendants should have expected Plaintiff to rely on the policies stated in the policies when he enrolled in Aquinas College and executed the scholarship agreement. Plaintiff reasonably expected Defendants would honor their express and implied promises, including that of fundamental fairness and the implied covenant of good faith and fair dealing.

50

276.   Plaintiff relied to his detriment on these express and implied promises and representation made by Defendants.

277.   Injustice can only be avoided by enforcement of Defendants' representations.

278.   As a direct and foreseeable result of Defendants' failure to honor their promises, Plaintiff has suffered injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.

279.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT V
## NEGLIGENCE AND NEGLIGENCE PER SE

280.   Plaintiff incorporates all preceding paragraphs above as though fully stated herein.

281.   When Defendants accepted Plaintiff's enrollment as a student, they entered into a duty of care towards Plaintiff to conduct themselves in a manner consistent with their policies and in a non-negligent manner.

282.   Defendants breached their duty of care towards Plaintiff when they conducted the investigation, hearing, and appeal processes in a way that was indifferent to the truth of the allegations made against Plaintiff as described above.

283. Because of Defendants' negligent conduct, Plaintiff has suffered severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.

284. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT VI
## GROSS NEGLIGENCE

285. Plaintiff incorporates all preceding paragraphs above as though fully stated herein.

286. Defendants were negligent and negligent per se in their investigation, hearing, and appeal processes regarding Plaintiff as described above.

287. Defendants recklessly disregarded the rights of Plaintiff and were callously indifferent to the effects their conduct would have on Plaintiff's reputation, mental health, and future.

288. Defendants' biases against Plaintiff amount to grossly negligent conduct and deviation from the standard of care.

289. Defendants' grossly negligent conduct has caused Plaintiff severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.

290.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## RELIEF REQUESTED

For all of the foregoing reasons, Plaintiff John Doe demands judgment against Defendants as follows:

a.   Declare the practices and actions of Defendants in violation of Title IX and the common law;

b.   Compensatory damages for monetary and non-monetary loss in whatever amount he is found to be entitled;

d.   Exemplary damages in whatever amount he is found to be entitled;

e.   Punitive damages in whatever amount he is found to be entitled;

f.   A judgment for past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects, in whatever amount he is found to be entitled;

g.   An order of this Court reversing the sanctions imposed against Plaintiff by Defendants;

h.   An order of this Court awarding reinstatement of Plaintiff as a student of Aquinas College, if he so desires, including reinstatement of all academic scholarships and placement on the hockey team;

i.   An order of this Court removing the Complaint, Investigative Report and sanctions from Plaintiff's file;

j.   An injunction of this Court prohibiting any further acts by Defendants violating Plaintiff's rights;

k.   An award of interest, costs and reasonable attorney fees; and

l.    Whatever other relief this Court finds appropriate.

Respectfully Submitted,
NACHTLAW, P.C.

/s/ David A. Nacht
David A. Nacht (P47034)
Adam M. Taub (P78334)
Attorneys for Plaintiff
101 N. Main Street, Suite 555
Ann Arbor, MI 48104
(734) 663-7550

Dated: June 11, 2018

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JOHN DOE,

     Plaintiff,                             Case No.

                                         Hon.

v.

AQUINAS COLLEGE and AQUINAS
COLLEGE BOARD OF TRUSTEES and
KEVIN KWIATKOWSKI,
STEPHEN BARROWS, and
KEVIN QUINN,
as agents for AQUINAS COLLEGE,

     Defendants.

_____

David A. Nacht (P47034)
Adam M. Taub (P78334)
NACHTLAW, P.C.
Attorneys for Plaintiff
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
dnacht@nachtlaw.com
ataub@nachtlaw.com

_____

## **DEMAND FOR TRIAL BY JURY**

NOW COMES Plaintiff, John Doe, by and through his attorneys, NachtLaw, P.C., and hereby demands for a jury trial in the above-captioned matter for all issues so triable.

Respectfully Submitted,
NACHTLAW, P.C.

/s/ David A. Nacht
David A. Nacht (P47034)
Adam M. Taub (P78334)
Attorneys for Plaintiff
101 N. Main Street, Suite 555
Ann Arbor, MI 48104
(734) 663-7550

Dated: June 11, 2018